# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ALFIE T. SLOANE, | ) | CASE NO. 4:13CV2052 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| DONALD MORGAN, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Alfie T. Sloane ("Sloane"), challenges the constitutionality of his conviction in

the case of *State v. Sloane*, Mahoning County Court of Common Pleas Case No. 2002-CR-311.

Sloane, *pro se*, filed a Petition for Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C. §

2254 on September 11, 2013.[1]  On February 20, 2014, Warden Donald Morgan ("Respondent")

filed a Motion to Dismiss the Petition as time-barred.  (Doc. No. 9.)  Sloane filed a Traverse on

May 21, 2014.  (Doc. No. 14.)

On June 30, 2014, the Court denied Respondent's Motion to Dismiss without prejudice

and ordered him to file an Answer to the Petition.  (Doc. No. 15.)  After receiving an extension

of time, Respondent filed a Return of Writ on September 19, 2014.  (Doc. No. 17.)  Sloane did

not file a Reply.

---

[1] Sloane filed his Petition in the United States District Court for the Southern District of
Ohio.  On September 17, 2013, the Southern District transferred the Petition to this
Court. (Doc. Nos. 2, 3.)

For reasons set forth in detail below, it is recommended that Sloane's Petition be DISMISSED as time barred.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts underlying Sloane's conviction as follows:

> {¶ 1}Appellant, Alfie T. Sloane, appeals his conviction on six counts of rape, in violation of R.C. 2907.02(A)(1)(b)(B), a felony of the first degree, one count of attempted rape, in violation of R.C. 2907.02(A)(1)(b)(B), a felony of the first degree, two counts of complicity to commit rape, in violation of R.C. 2907.02(A)(1)(b)(B), a felony of the first degree, and seven counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4)(B), a felony of the third degree.

> {¶ 2} His victims were his stepdaughter, T.W., who was between the ages of eight and nine at all times relevant to the superseding indictment, and three of her friends who regularly spent the night at Appellant's home: T.P., who was between the ages of six and seven at all times relevant to the superseding indictment, (Trial Tr., p. 18), A.S., who was between the ages of eight and nine at all times relevant to the superseding indictment, and A.S.'s sister, B.G., who was between the ages of four and five at all times relevant to the superseding indictment. Appellant received a mandatory sentence of life imprisonment based upon the jury's additional findings that he used force or the threat of force in committing the rape crimes.

*State v. Sloane*, 2009 WL 685274 at * 1 (Ohio App. 7th Dist. March 10, 2009).

## II.  Procedural History

### A.     Trial Court Proceedings and Conviction

On April 25, 2002, a Mahoning County Grand Jury charged Sloane with (1) four counts of disseminating matter harmful to a juvenile in violation of Ohio Revised Code ("O.R.C.") §

-2-

2907.31(A)(D) (Counts One through Four);[2] (2), eight counts of rape in violation of O.R.C. §

2907.02(A)(1)(b)(2)(B) (Counts Five through Eight, Fourteen, Fifteen, Eighteen, and Nineteen);

(3) seven counts of gross sexual imposition in violation of O.R.C. § 2907.05(A)(4)(B) (Counts

Nine through Twelve, Sixteen, Seventeen, and Twenty); and, (4) one count of attempted rape in

violation of O.R.C. §§ 2923.02 and 2907.02(A)(1)(b)(2)(B) (Count Thirteen.  (Doc. No. 9-1,

Exh. 1.)  Attorney John P. Laczko was appointed as counsel.  (Doc. No. 9-1, Exh. 4.)  On May 7,

2002, Sloane entered a plea of not guilty.  *Id.*

On June 5, 2002, Sloane filed his first Motion to Determine Competency.  (Doc. No. 9-1,

Exh. 5.)  Therein, Mr. Laczko argued that "[b]ased upon Defendant's history of mental

impairment including a previous institutionalization in Columbus, Ohio in 1998, his most recent

institutionalizion at St. Elizabeth's Hospital Psychiatric Unit in March of 2002, where the

Defendant was at the time of his arrest on the instant charges and the fact that since March 14,

2002, Defendant has been housed in N-Pod, the medical psychiatric Pod at the Mahoning County

Justice Center, it appears that Defendant is and will be incapable of understanding the nature and

objective of the proceedings against him as well as being incapable of assisting in his defense."

*Id.*  The trial court granted the motion; stayed the proceedings; and, referred Sloane to Northcoast

Behavioral Healthcare System for examination.  (Doc. No. 9-1, Exh. 6.)

---

[2] As the state appellate court noted, "the original indictment charged [Sloane] with
'having custody, control, or supervision of a commercial establishment,' and,
'display[ing] at the establishment material that is harmful to juveniles and that is open to
view by juveniles as part of the invited general public.' (4/25/02 Indictment, Counts One
through Four). Although the first four counts of the original indictment purported to
assert violations of R.C. 2907.31(A)(D) (disseminating material harmful to juveniles),
they actually alleged violations of R.C. 2907.311 (displaying material harmful to
juveniles)."  *State v. Sloane*, 2009 WL 685274 at * 1 (Ohio App. 7th Dist. March 10,
2009).

On August 1, 2002, Stanley J. Palumbo, Ph.D., submitted a Competency Evaluation report. (Doc. No. 17-1 at Exh. B.) Dr. Palumbo found Sloane had "much rambling speech" and was "difficult to follow." *Id*. at 9. He noted Sloane's thought content included suspiciousness and that Sloane "had an imaginary friend [named Jimmy] whose voice he could hear and who he states was telling him that the food was poisoned and not to trust anyone." *Id.* Dr. Palumbo also found that Sloane's affect was inappropriate; he had "very poor judgment with regard to his mental illness;" his level of cooperation was poor; and, his attention and concentration "varied." *Id*. at 9-10. Dr. Palumbo attempted to administer the Wechsler-Adult Intelligence Scale- Third Edition but discontinued the testing after Sloane "gave bizarre statements to many of the test items and would often miss easy items." *Id*. Dr. Palumbo assessed that Sloane appeared to be functioning in the low-average range of intelligence. *Id.*

Dr. Palumbo diagnosed Schizophrenia, Paranoid Type, Prior History. *Id*. at 12. He concluded Sloane is "currently not capable of understanding the nature and objectives of the proceedings against him and/or presently assisting in his defense," in light of his "bizarre thinking, inappropriate affect, confusion, disorganization, poor concentration, and delusional thinking." *Id*. Dr. Palumbo further assessed that Sloane was in need of inpatient hospitalization and that "given defendant's symptoms of mental illness and availability of treatment, [he] would be restored to competency within one year." *Id*.

The trial court held a hearing on October 3, 2002, at which time Sloane was determined to be incompetent to stand trial. (Doc. No. 9-1 at Exh. 8.) The trial court further found Sloane "has been diagnosed as having mild mental retardation and suffers from other psychological problems," but determined there was a substantial probability that Sloane would become

-4-

competent to stand trial within one year if provided a course of treatment.  *Id*.  The court ordered Sloane to undergo inpatient treatment at Northcoast Behavioral's Cleveland campus.  *Id*.

On March 10, 2003, Sloane filed a motion to re-evaluate his competency.  (Doc. No. 9-1 at Exh. 9.)  In the memorandum supporting his motion, Sloane noted that Dr. Jonathan Sirkin, a psychologist at Northcoast, had prepared a report concluding Sloane was now competent to stand trial.[3]  *Id*.  Sloane requested the trial court afford him a second opinion.  *Id*.  On March 18, 2003, the trial court conducted a hearing on the motion, at which time the parties stipulated to Dr. Sirkin's report.  (Doc. No. 9-1 at Exh. 10.)  The trial court then found Sloane competent to stand trial; granted him leave to amend his plea to not guilty by reason of insanity; and, ordered a sanity evaluation.  *Id*.

Dr. Palumbo conducted the sanity evaluation and issued a report on March 27, 2003. (Doc. No. 17-1 at Exh. D.)  Dr. Palumbo again diagnosed schizophrenia, paranoid type "based on [Sloane's] symptoms of bizarre thinking with a loose delusional system of a persecutory nature." *Id*. at 25.  After reviewing Sloane's past and current mental status, Dr. Palumbo concluded with

---

[3] In his report, Dr. Sirkin noted Sloane was admitted to Northcoast Behavioral on October 15, 2002 and that, since then, had been treated with Zyprexa, Prozac, Seroquel and Vistaril.  (Doc. No. 17-1 at Exh. C.)  He noted that, since January 2003, "Mr. Sloane has shown no signs or symptoms of psychotic thinking, and interacts appropriately on the treatment unit."  *Id*.  Based on Sloane's history of "bona fide hallucinations," Dr. Sirkin diagnosed Psychotic Disorder, not otherwise specified.  *Id*.  He also diagnosed malingering based on Sloane's conduct when he was evaluated by another doctor at Northcoast, Dr. Ostermeyer.  *Id*.  As explained in the report, "Mr. Sloane was stable without any symptoms of psychosis both before and after his evaluation by Dr. Ostermeyer.  He also had no difficulty understanding the court material before and after his evaluation. Yet, during the evaluation by Dr. Ostermeyer, he was talking to his 'imaginary friend Jimmy' and denied knowing basic courtroom terms." *Id*.  Ultimately, Dr. Sirkin concluded Sloane was competent to stand trial; i.e., capable of understanding the nature and objectives of the court proceedings and of assisting in his own defense.  *Id*.

reasonable scientific certainty that, at the time Sloane was charged, he "was suffering from a severe mental disease, but was not suffering from a mental defect, such as mental retardation." *Id*. Specifically, Dr. Palumbo concluded Sloane was suffering from "confusion, disorganization, and probable auditory hallucinations [i.e., hearing the voice of his imaginary friend, Jimmy] at the time of the events leading up to the arrest." *Id*. However, Dr. Palumbo nevertheless concluded that "even though [Sloane] was suffering from a severe mental disease, he would have known the wrongfulness of his acts." *Id*. Thus, he concluded that "even though the defendant may have been suffering from some thought disorder involving an imaginary friend that spoke to the defendant, the thought disorder was not directly related to the events leading up to the defendant's arrest." *Id.*

On April 1, 2003, Sloane requested, and was formally granted, leave to amend his plea to not guilty and not guilty by reason of insanity.  (Doc. No. 9-1 at Exhs. 11, 12, 13.)   In June 2003, Sloane requested appointment of new counsel.  (Doc. No. 9-1 at Exh. 14.)  After several continuances, the trial court appears to have conducted a hearing on the motion; removed Mr. Laczko as Sloane's counsel; and, appointed attorney Ronald Yarwood.  (Doc. No. 9-1 at Exhs. 14-18.)  On September 25, 2003, however, the trial court issued a Judgment Entry re-appointing Mr. Laczko "upon oral request of the Defendant."  (Doc. No. 9-1 at Exh. 19.)

On the date trial was scheduled to begin, October 22, 2003, Sloane filed a Motion to Re-Evaluate his Competency.  (Doc. No. 9-1, Exh. 21.)  Citing Dr. Palumbo's conclusion that Sloane had a thought disorder, Sloane requested a "second opinion regarding the effect of his disorder upon his ability to stand trial and appreciate the wrongfulness of his actions herein." *Id*.  The trial court granted the motion; stayed the proceedings; and, ordered that Sloane undergo both a

third competency evaluation, and a sanity evaluation.  (Doc. No. 9-1, Exh. 22, 23.)  The trial

court also ordered that defense counsel Laczko be present for the evaluation.  (Doc. No. 9-1, Exh.

23; Doc. No. 17-1, Exh. E.)

On December 4, 2003, Anil Nalluri, M.D., submitted a "Multiaxial Forensic Psychiatric

Evaluation" report regarding Sloane's competency to stand trial and sanity at the time of the

offenses.  (Doc. No. 17-1, Exh. F.)  Dr. Nalluri determined Sloane did not reveal any evidence of

schizophrenia, bipolar disorder, or mental retardation.  *Id.*  He noted Sloane's thought process

was organized, logical, relevant and sequential; and, found his level of concentration to be

normal.  *Id.*  Sloane told Dr. Nalluri that he "hears voices," but Dr. Nalluri did not see any

evidence Sloane was hallucinating.  *Id.*  Based on his clinical interview, Dr. Nalluri concluded

Sloane has "average intelligence for his socioeconomic and educational level."  *Id.*  In addition,

he diagnosed Dissociative Disorder, Not Otherwise Specified, "also known as 'Ganser's

Syndrome.'"[4]  *Id.*  Ultimately, Dr. Nalluri found Sloane was competent to stand trial and, further,

that "[t]here is no evidence that [Sloane] was suffering from a psychosis at the time of the alleged

acts for which he is charged."  *Id.*

The matter came on for hearing, at which time the trial court once again determined

Sloane was competent to stand trial.  (Doc. No. 9-1, Exh. 26 and Exh. 29 at p. 69)  On that same

---

[4]  Dr. Nalluri's report defines "Dissociative Disorder NOS (Ganser's Syndrome)" as
 follows: "This category is included for disorders in which the predominant feature is a
dissociative symptom (i.e., a disruption in the usually integrated functions of
consciousness, memory, identity, or perception of the environment) that does not meet
the criteria for any specific Dissociative Disorder. * * * The hallmark symptoms of
Ganser's Syndrome is paralogia, the giving of approximate answers to questions . . .
Although afflicted individuals typically know their names, they often only approximate
other key personal information such as age, address, and occupation."

date, Sloane withdrew his plea of not guilty by reason of insanity, and pled guilty to six counts of

rape (Counts 5, 6, 7, 8, 14 and 15) with a stipulation to sexual predator classification.  (Doc. No.

9-1, Exh. 25; Exh. 29 at 70-81.)  The trial court accepted his plea to the six rape counts, and

dismissed the remaining charges as well as the life specifications on the rape counts to which

Sloane pled guilty.  (Doc. No. 9-1, Exhs. 25, 26; Exh. 29 at p. 82.)

On March 12, 2004, Sloane filed a motion to withdraw his guilty plea, and his trial

counsel filed a motion to withdraw.  (Doc. No. 9-1, Exhs. 27, 28.)  In his motion to withdraw,

Mr. Laczko stated that the attorney client relationship had deteriorated because "Defendant has

alleged that counsel misrepresented plea offers to him as enticement to have Defendant enter" his

guilty plea.  (Doc. No. 9-1, Exh. 28.)  The State opposed the motion to withdraw plea.  (Doc. No.

9-1, Exh. 29.)

After several continuances, on June 1, 2004, the trial court convened a hearing on the

pending motions.  (Doc. No. 9-1, Exh. 33.)  On the day of the hearing, however, Sloane

requested yet another competency evaluation.  *Id.*  The trial court granted the motion; stayed the

proceedings; and, referred Sloane to Thomas Eberle, Ph.D., for evaluation.  *Id*.  Dr. Eberle

submitted a Competency Evaluation report on July 15, 2004.  (Doc. No. 17-1, Exh. G.)  Therein,

he noted Sloane "alleges that he still hears unspecified voices of people advising him that he is

going to die, that others are out to harm him . . . ., and that the food in the jail is poisoned."  *Id*.

Moreover, Sloane reported seeing "a man outside his window in a white suit and hat (he cannot

explain the significance)."  *Id*.  Despite these allegations, however, Dr. Eberle found that

Sloane's behavior was "organized and controlled during the examination and his overall contact

with reality seemed generally intact in routine areas."  *Id*.  Dr. Eberle found Sloane's

-8-

"conversation suggested only low average intellectual capacity at best, but no indication of impaired concentration, autistic thinking, loose associations or otherwise disordered thought processes, despite the bizarre claims of hallucinations and his imaginary friend." *Id*.  In addition, Dr. Eberle observed that Sloane "knew a considerable amount about his situation and the legal system." *Id*.

Based on his examination, Dr. Eberle diagnosed (1) schizoaffective disorder, depressed type, in significant remission at present; (2) malingering; and, (3) mixed personality disorder, severe, with borderline and antisocial features.  (Doc. No. 17-1, Exh. G.)   He further concluded that Sloane was "quite competent to stand trial and, in fact, may well be manipulating the system." *Id*.  Dr. Eberle noted that Sloane demonstrated "sufficient and appropriate knowledge" of the charges against him, the judicial proceedings, and the roles of the participants in those proceedings.  Finally, he observed that Sloane "has a history of manipulating presentations of his knowledge in this area for obvious purposes and may well do so again, but there is nothing in his mental status or psychiatric disabilities to scientifically explain such changes and manipulations." *Id.*

The trial court conducted a hearing on July 27, 2004.  At that time, defense counsel Laczko stated he had reviewed Dr. Eberle's report and consulted with Sloane and reported that "we are satisfied regarding the determination made by Dr. Eberle regarding [Sloane's] competence to stand trial, to make decisions that need to be made in this case, and proceed regarding the motion to withdraw his guilty plea."  (Doc. No. 17-1, Exh. H at p. 47.)   The trial court found Sloane competent to stand trial and, additionally, sustained Mr. Laczko's motion to withdraw as counsel.  *Id*. at p. 48.  John Juhasz was then appointed to represent Sloane.  *Id. See*

-9-

*also* Doc. No. 9-1, Exh. 34.

On November 22, 2004, after several continuances and a hearing, the trial court permitted Sloane to withdraw his guilty plea.  (Doc. No. 9-1, Exhs. 35, 37, 41.)  On that same date, Sloane entered a waiver of his right to a speedy trial.  (Doc. No. 9-1, Exh. 40.)  Over the next several months, the trial court granted a number of continuances of the trial date.[5]  (Doc. No. 9-1, Exhs. 45-53.)

On April 6, 2006, the Mahoning County Grand Jury issued a superseding indictment, which charged the same crimes but changed the language of Counts One through Four and added language to the rape and gross sexual imposition charges.[6] (Doc. No. 9-1, Exh. 54.)  Sloane pled not guilty.  (Doc. No. 9-1, Exh. 55.)  He then moved to dismiss the superseding indictment on various grounds, arguing (among other things) that the original rape charges were void and,

---

[5]  On March 30, 2005, Sloane filed a *pro se* motion requesting permission to represent himself "as co-counsel."  (Doc. No. 9-1, Exh. 44.)  It is unclear from the docket whether the trial court ever ruled on this motion.

[6]  The state appellate court described the changes in the superseding indictment as follows: "{¶ 4} After Appellant executed a valid waiver of his speedy trial rights, the state filed a superseding indictment charging him with the same crimes, except that the displaying material harmful to juveniles charges were replaced with disseminating material harmful to juveniles charges. Counts One though Four of the superseding indictment charged that Appellant did, 'directly sell, deliver, furnish, disseminate, provide, exhibit, rent or present to a juvenile * * * any material or performance that is obscene or harmful to juveniles.' (4/6/06 Superseding Indictment, Counts One through Four.)  {¶ 5} The superseding indictment also added language to the rape and gross sexual imposition charges.  The original indictment failed to specifically charge that Appellant was not the spouse of his victims, which is an essential element of those crimes.  In addition to the required statutory language, the superseding indictment also added a list of aliases used by Appellant, and indicated that each of the victims was under ten years of age when the crimes were committed."  *State v. Sloane*, 2009 WL 685274 at * 1.

-10-

therefore, his speedy trial waiver was "a nullity."  (Doc. No. 9-1, Exh. 57.)  After conducting a

hearing on the motion, the trial court dismissed Counts One through Four, but denied the motion

with respect to the rape, attempted rape, and gross sexual imposition charges.  (Doc. No. 9-1,

Exh. 61.)

The matter proceeded to jury trial on August 7, 2006.  (Doc. No. 9-1, Exh. 63.)  Four days

later, on August 11, 2006, a jury found Sloane guilty on six counts of rape (Counts 5, 6, 7, 8, 14,

15); seven counts of GSI (Counts 9, 10, 11, 12, 16, 17, 20); one count of attempted rape (Count

13); and, two counts of complicity to commit rape (Counts 18, 19.)  (Doc. No. 9-1, Exhs. 62-64.)

On August 31, 2006, the trial court sentenced Sloane to life sentences on each of the rape

convictions (Counts Five through Eight; Fourteen, Fifteen, Eighteen, and Nineteen); eight years

incarceration on the attempted rape conviction (Count Thirteen); and, five years on each of the

seven gross sexual imposition charges (Counts Nine through Twelve, Sixteen, Seventeen, and

Twenty).  (Doc. No. 9-1, Exh. 64.) The sentences were to be served consecutively for an

aggregate term of eight life sentences and 43 years incarceration.  *Id.*   The trial court also

determined Sloane was a sexual predator and advised him of his duties to register.  (Doc. No. 9-

1, Exh. 65.)

**B.   Direct Appeal**

On September 13, 2006, Sloane, through new counsel, timely appealed to the Court of

Appeals for the Seventh Appellate District ("state appellate court"), raising the following

assignments of error:

> I.  THE TRIAL COURT DEPRIVED APPELLANT SLOANE OF HIS
> CONSTITUTION [SIC] RIGHT TO A SPEEDY TRIAL, UNDER THE SIXTH
> AMENDMENT, AND HIS STATUTORY RIGHT TO A SPEEDY TRIAL,
> UNDER R.C. § 2945.71 ET SEQ. (APP. AT 13),WHEN IT ALLOWED THE

STATE TO PROSECUTE HIM ON A SUPERSEDING INDICTMENT, THAT AROSE FROM THE SAME FACTS AND EVIDENCE AS THE ORIGINAL INDICTMENT FOUR YEARS AFTER THE DATE OF HIS ARREST. (ORDER AUGUST 15, 2006).

II. THE STATE FAILED TO MEET ITS CONSTITUTIONAL BURDEN OF PROOF BEYOND A REASONABLE DOUBT, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT, WHEN IT FAILED TO OFFER SUFFICIENT EVIDENCE TO SHOW THAT I.S. WAS COMPELLED BY FORCE OR THREAT OF FORCE TO ENGAGE IN SEXUAL CONDUCT WITH APPELLANT SLOANE (TRANS. VOL. II, P. 357-358.)

III. THE STATE FAILED TO MEETS ITS CONSTITUTIONAL BURDEN OF PROOF BEYOND A REASONABLE DOUBT, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT, WHEN IT FAILED TO OFFER SUFFICIENT EVIDENCE TO SHOW THAT B.G. ENGAGED IN SEXUAL CONDUCT WITH APPELLANT SLOANE (TRANS. VOL. II, P. 357-358.)

(Doc. No. 9-2, Exh. 66, 67.)  With the court's permission, Sloane, through counsel,  filed a

supplemental brief, raising the following two additional assignments of error:

I. APPELLANT SLOANE'S CONVICTIONS FOR RAPE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF SECTION 3(B)(3) ARTICLE IV OHIO CONSTITUTION, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE BECAUSE THE GREATER WEIGHT OF THE EVIDENCE SHOWED THAT I.S. WAS NOT FORCED, NOR THREATENED WITH FORCE, TO ENGAGE IN SEXUAL CONDUCT (TRANSCRIPT PASSIM).

II. APPELLANT SLOANE'S CONVICTIONS FOR RAPE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF SECTION 3(B)(3) ARTICLE IV OHIO CONSTITUTION, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE BECAUSE THE GREATER WEIGHT OF THE EVIDENCE SHOWED THAT B.G. NEITHER ENGAGED IN SEXUAL CONDUCT, NOR WAS COMPELLED TO DO SO, WITH APPELLANT SLOANE (TRANSCRIPT PASSIM).

(Doc. No. 9-2, Exhs. 72,73.)

On March 10, 2009, Sloane's convictions were affirmed.  (Doc. No. 9-2 at Exh. 75.)  *See*

*also State v. Sloane*, 2009 WL 685274 (Ohio App. 7th Dist. March 10, 2009).

On April 20, 2009, Sloane, through counsel, filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No. 9-2, Exh. 76.)  In his Memorandum in Support of Jurisdiction, Sloane raised the following five propositions of law:

I.  THE UNITED STATES CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL UNDER THE SIXTH AMENDMENT AND THE RIGHT TO A SPEEDY TRIAL UNDER R.C. § 2945.71 MANDATE A DISMISSAL WITH PREJUDICE WHEN THE STATE PROSECUTES ON A SUPERSEDING INDICTMENT ARISING FROM THE SAME FACTS AND EVIDENCE AS THE ORIGINAL INDICTMENT FOUR YEARS AFTER THE DATE OF ARREST.

II.  ARTICLE IV SECTION 3(B)(3) OF THE OHIO CONSTITUTION MANDATES A REVERSAL OF A CONVICTION THAT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE WHEN THE STATE FAILED TO PROVE THAT APPELLANT SLOANE COMPELLED A.S. TO ENGAGE IN SEXUAL CONDUCT BY FORCE OR THREAT OF FORCE.

III.  ARTICLE IV SECTION 3(B)(3) OF THE OHIO CONSTITUTION MANDATES A REVERSAL OF A CONVICTION THAT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE WHEN THE STATE FAILED TO PROVE THAT APPELLANT SLOANE COMPELLED B.G. TO ENGAGE IN SEXUAL CONDUCT BY FORCE OR THREAT OF FORCE.

IV.  THE CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT REQUIRES REVERSAL OF A CONVICTION WHEN THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE THE CRIME ALLEGED BEYOND A REASONABLE DOUBT, SPECIFICALLY THAT APPELLANT SLOANE COMPELLED A.S. TO ENGAGE IN SUCH CONDUCT BY FORCE OR THREAT OF FORCE.

V.  THE CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT REQUIRES REVERSAL OF A CONVICTION WHEN THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE THE CRIME ALLEGED BEYOND A REASONABLE DOUBT, SPECIFICALLY THAT APPELLANT SLOANE ENGAGED IN SEXUAL CONDUCT WITH B.G. OR COMPELLED B.G. TO ENGAGE IN SUCH CONDUCT BY FORCE OR THREAT OF FORCE.

-13-

(Doc. No. 9-2, Exh. 77.)  On July 1, 2009, Sloane's appeal was dismissed as not involving any

substantial constitutional question.  (Doc. No. 9-2, Exh. 79.)

**C.   Application to Reopen Appeal / Postconviction Relief**

On October 1, 2009, Sloane filed a *pro se* Application to Reopen Appeal pursuant to Ohio

App. R. 26(B).  (Doc. No. 9-2, Exh. 80.)  Therein, Sloane argued his appellate counsel should

have raised the following assignments of error on appeal:

> I.  THE APPELLANT, AN AFRICAN AMERICAN, WAS DENIED EQUAL
> PROTECTION OF THE LAW AND THE RIGHT TO EFFECTIVE
> REPRESENTATION WHEN TRIAL COUNSEL INSTRUCTED HIM TO SIGN
> SPEEDY TRIAL WAIVER IN VIOLATION OF THE SIXTH AND
> FOURTEENTH AMENDMENTS TO THE UNITED STATES
> CONSTITUTION.
>
> II.  THE COURT VIOLATED DEFENDANT'S DUE PROCESS RIGHTS
> WHEN EXCEEDED THE 270 DAY LIMITATION PROVIDED BY R.C.
> 2945.71 THAT REQUIRES HE BE BROUGHT TO TRIAL.
>
> III.  THE JUDGMENT ENTERED BY THE TRIAL COURT AND THE
> INDICTMENTS RETURNED BY THE GRAND JURY ARE NULL AND
> VOID FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE
> TO CHARGE AS DEFINED BY STATUTE.
>
> IV.  THE COMBINED EFFECT OF ERRORS NO: 1, 2 AND 3 RENDERED
> APPELLANT'S TRIAL FUNDAMENTALLY UNFAIR AND RESULTED IN A
> BREAKDOWN OF THE CRIMINAL TRIAL PROCESS VIOLATING THE
> SUBSTANTIVE DUE PROCESS RIGHTS OF APPELLANT SECURED BY
> THE 5TH AMENDMENT.

(Doc. No. 9-2, Exh. 80.)  On February 18, 2010, the state appellate court issued an Opinion &

Order in which it recognized Sloane's Application was untimely but found he had shown good

cause for the delay.   (Doc. No. 9-2, Exh. 81.)  The court went on to deny Sloane's Application,

however, finding that "because [he] has reasserted claims made by his appellate counsel in the

underlying appeal and raised claims that would not have been meritorious had they been raised in

his original appeal, [Sloane] has failed to establish that his appellate counsel was ineffective." *Id.*
*See also State v. Sloane*, 2010 WL 598645 at * 4 (Ohio App. 7th Dist. Feb. 18, 2010).  Sloane did
not appeal.

**D.    Federal Habeas Petition**

On September 11, 2013,[7] Sloane filed a *pro se* Petition for Writ of Habeas Corpus and
asserted the following grounds for relief:

> **GROUND ONE**: Petitioner was denied his constitutional right to a speedy trial,
> under the Ohio and U.S. Constitutions.
>
> **SUPPORTING FACTS**: Petitioner was not brought to trial within the statutory
> time requirements under the speedy trial provisions and thus he was deprived of
> his rights under the law.  Moreover, Petitioner did not knowingly, voluntarily, and
> intelligently execute a waiver of his speedy trial rights, inasmuch as he was
> mentally retarded, and not aware of the consequences of signing a waiver under
> compulsion for an attorney who was removed from the Petitioner's case on July
> 27, 2007, who took advantage of the Petitioner's mental condition, because the
> attorney was not the Petitioner's assigned counsel.
>
> **GROUND TWO**: Petitioner asserts that he was denied his constitutional rights
> when he was compelled to sign a waiver to a speedy trial by an attorney who was
> removed from the case and replaced after he was diagnosed as having mild
> retardation and other psychological problems.
>
> **SUPPORTING FACTS**: On April 25, 2002, Petitioner was originally indicted.
> On October 7, 2002 the Petitioner is held incompetent to stand trial and he is
> incapable of understanding the nature and objective of proceedings against him,
> and he is also incapable of assisting in his criminal defense.  Furthermore,
> Petitioner has been diagnosed as having mild mental retardation and also suffers
> from other psychological problems.  (See also, p. 6 Facts, incorporated herewith
> by specific reference).
>
> **GROUND THREE**: Petitioner was denied his constitutional right to the effective
> assistance of counsel.

---

[7]  The Petition is signed, but not dated.  (Doc. No. 1 at 16.)  Thus, the Court is unable to
determine when Sloane delivered it to the prison mailroom.

**SUPPORTING FACTS**: See pages 6 and 8, cited herein and incorporated herein by specific reference, as if, reprinted here in full.

**GROUND FOUR**: Petitioner was entitled to have his indictment dismissed when the State amended the original indictment and made changes to the name and charges, in contravention to the Petitioner's rights.

**SUPPORTING FACTS**: Petitioner's original indictment was defective and thus void. Moreover, the amended and/or superseding indictment was time barred and therefore defective since it had been changed from its original charges that were established from the original grand jury indictment.

**GROUND FIVE**: Petitioner's Constitutional Rights to a proper grand jury indictment were violated, when the indictment omitted essential elements of the crimes charged, and therefore, the original indictment was defective.

**GROUND SIX**: Petitioner's Constitutional Rights were violated by the State when it failed to prove every ingredient of the offenses beyond a reasonable doubt, and shift the burden of proof to the Petitioner by presuming that ingredient upon proof of the other elements of the indicted offenses.

**SUPPORTING FACTS FOR GROUNDS FIVE AND SIX**: See Habeas Corpus Petition pages 6, 8, 9, 11 ("Supporting Facts").

(Doc. No. 1.)

On February 20, 2014, Warden Donald Morgan ("Respondent") filed a Motion to Dismiss the Petition as time-barred. (Doc. No. 9.) Sloane filed a Traverse on May 21, 2014, in which he argued he was entitled to equitable tolling based on his mental retardation and other mental disorders. (Doc. No. 14.) On June 30, 2014, the Court denied Respondent's Motion to Dismiss without prejudice and ordered him to file an Answer to the Petition. (Doc. No. 15.) After receiving an extension of time, Respondent filed a Return of Writ on September 19, 2014. (Doc. No. 17.) Sloane did not Reply.

## II.  Statute of Limitations

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> (d)(1) A one year period of limitations shall apply to the filing of an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1) & (2).

## A.    One-Year Limitation

The AEDPA establishes a general rule that there is a one-year statute of limitations for

filing a habeas petition in federal court for persons in custody pursuant to the judgment of a state

court.  28 U.S.C. § 2244(d)(1).  *See Mackey v. Warden, Lebanon Correctional Institution*, 2013

WL 1908890 at * 3 (6th Cir. May 9, 2013).  Subsection 2244(d)(1)(A) indicates that the limitations

period runs from the date on which the state court judgment becomes final by conclusion of direct

-17-

review or the expiration of the time for seeking such review, whichever is later.  The Sixth Circuit

has found that, for petitioners who seek review on direct appeal in the Supreme Court of Ohio,

"the one-year statute of limitations does not begin to run until the time for filing a petition for a

writ of certiorari for direct review in the United States Supreme Court has expired."  *Bronaugh v.*

*Ohio*, 235 F.3d 280, 282 (6th Cir. 2000).  *See also Ajumu v. Goodrich*, 2014 WL 1236268 at * 1

(N.D. Ohio March 24, 2014); *Pimental v. Hudson*, 2008 WL 4186922 at * 1 (N.D. Ohio Sept. 5,

2008).

Here, Sloane was sentenced on August 31, 2006 and timely appealed on September 13,

2006.  (Doc. No. 9-1, Exh. 64; Doc. No. 9-2 at Exh. 66.)  The state appellate court affirmed his

convictions and sentences on March 10, 2009, and Sloane timely appealed to the Ohio Supreme

Court.  (Doc. No. 9-2, Exhs. 75, 76)  The Ohio Supreme Court dismissed Sloane's appeal on July

1, 2009.  (Doc. No. 9-2, Exh. 79.)  Based on this sequence of events, Respondent argues Sloane's

convictions and sentences became "final" for purposes of § 2244(d)(1)(A) on September 29, 2009,

ninety (90) days after the Ohio Supreme Court dismissed his appeal and the time period for

seeking a petition for writ of certiorari in the United States Supreme Court expired.

However, Respondent correctly notes that the AEDPA tolls the one-year limitations period

during the time "'a properly filed application for State postconviction or other collateral review . . .

is pending.' § 2244(d)(2)."  *Evans v. Chavis*, 546 U.S. 189, 191 (2006); *Carey v. Saffold*, 536 U.S.

214 (2002); *accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003).  "The time that an

application for state postconviction review is 'pending' includes the period between (1) a lower

court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the

filing of the notice of appeal is timely under state law."  *Id.*

-18-

Only "properly filed" applications for postconviction relief or collateral review toll the statute of limitations, and "a state postconviction petition rejected by the state court as untimely is not 'properly filed' within the meaning of § 2244(d)(2)." *Allen v. Siebert*, 552 U.S. 3, 128 S. Ct. 2, 3 (2007); *Pace v. DiGuglielmo,* 544 U.S. 408, 125 S.Ct. 1807 (2005) ("time limits, no matter their form, are 'filing' conditions, and a state postconviction petition is therefore not 'properly filed' if it was rejected by the state court as untimely"); *Monroe v. Jackson*, 2009 WL 73905 at *2 (S.D. Ohio Jan. 8, 2009).  A timely filed state post-conviction matter, however, cannot serve to toll a statute of limitations which has already expired before the motion was filed.  *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003).  Section 2244(d)(2)'s tolling provision "does not ... 'revive' the limitations period (*i.e.*, restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations."  *Vroman*, 346 F.3d at 602 (citation omitted).  Further, if a state court ultimately denies a petition as untimely, that petition was neither properly filed nor pending and a petitioner would not be entitled to statutory tolling.  *See Monroe* at *2; *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007).

Here, Sloane filed his 26(B) Application on October 1, 2009.  Thus, the limitations period ran from the date his conviction became final, i.e. September 29, 2009, for one day until October 1, 2009.  The statute was then tolled until the state appellate court denied the Application on February 18, 2010, and began to run again on February 19, 2010.  Sloane did not appeal from the denial of his 26(B) Application, and did not file any other post-conviction motions that might have potentially tolled the statute of limitations.  Therefore, the limitations period ran uninterrupted from February 19, 2010 for 364 days until it expired on February 18, 2011.  Because Sloane did

-19-

not file his habeas petition until September 11, 2013, Respondent argues it is over two years late and should be dismissed as time-barred.[8]  (Doc. No. 9 at 14.)

The Court agrees with Respondent and finds that Sloane's Petition is untimely for the reasons set forth above.[9]  Therefore, unless equitable tolling is appropriate or Sloane is entitled to begin calculating the statute of limitations from an alternative date, his Petition should be dismissed as time-barred.

### B.   Factual Predicate

Pursuant to 28 U.S.C. § 2244(d)(1)(D), the statute of limitations may commence later than the date when a petitioner's conviction became final if "the factual predicate of the claim or claims presented" was not discovered by a petitioner, acting with due diligence, until a later date.  For the following reasons, it is recommended the Court find Sloane has failed to establish that the statute of limitations commenced at a later date pursuant to this provision.

Sloane's first and second habeas claims assert he was not brought to trial "within the statutory time requirements under the speedy trial provisions" and, further, that he did not knowingly, voluntarily and intelligently waive his speedy trial rights.  In his third habeas claim,

---

[8] In calculating these dates, Respondent does not toll the statute of limitations during the 45 day time period during which Sloane could have filed an appeal from the state appellate court's denial of his 26(B) Application.  Sloane does not argue the limitations period should be tolled during this 45 day time period.  Even if the Court were to afford Sloane every benefit of the doubt and toll the limitations period an additional 45 days, his Petition would remain over two years late.

[9] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to the prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  As noted above, Sloane's Petition is signed but not dated and, thus, it is not clear when he provided it to the prison for mailing.  However, the Court agrees with Respondent that "[s]ince the petition is late by a number of years, the exact date of filing under *Houston* is not dispositive here." (Doc. No. 17 at 14, fn. 7.)

-20-

Sloane argues this trial counsel was ineffective because he took advantage of Sloane's mental retardation and compelled him to waive his speedy trial rights.  Sloane's fourth ground for relief asserts his original indictment was defective and the superseding indictment was time-barred and "therefore defective since it had been changed from its original charges that were established from the original grand jury indictment." (Doc. No. 1.)  In his fifth habeas claim, Sloane argues his right to a "proper grand jury indictment" was violated when the original indictment omitted essential elements of the crimes charged.  Finally, in his sixth ground for relief, Sloane argues the State failed to prove every "ingredient of the offense beyond a reasonable doubt."  *Id.*

Sloane does not argue that the factual predicates of these claims became known to him after his conviction became final.  Indeed, by their very nature, these claims are based on facts that would have been known to Sloane at the time of sentencing in August 2006.  As such, they cannot serve to delay the running of the statute of limitation under § 2244(d)(1)(D). Accordingly, the Court finds Sloane has failed to identify any factual predicate that would justify a later start date for the statute of limitations.[10]

## C. Equitable Tolling

The AEDPA statute of limitations period is also subject to equitable tolling.  *See Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010).  Equitable tolling "allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control."  *Robertson v. Simpson*, 624

---

[10]Sloane does not argue that the limitations period should commence at a later date because (1) he was prevented from filing his Petition due to an impediment created by State action in violation of the Constitution or laws of the United States; or, (2) a constitutional right asserted in the Petition was newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review. *See* § 2244(d)(1)(B), (C).

F.3d 781, 783 (6ᵗʰ Cir. 2010). *See also Hall v. Warden, Lebanon Correctional Institution*, 662 F.3d 745, 749 (6ᵗʰ Cir. 2011). However, the equitable tolling doctrine is granted by courts only "sparingly." *See Robertson*, 624 F.3d at 784. Moreover, "although 'the party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run,' the petitioner bears the ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Ata v. Scutt*, 662 F.3d 736, 741 (6ᵗʰ Cir. 2011)(quoting *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir.2002)).

In order to be entitled to equitable tolling, a habeas petitioner must establish that (1) he has been pursuing his rights diligently; and, (2) some extraordinary circumstance stood in his way and prevented timely filing. *Holland*, 130 S.Ct. at 2565. *See also Hall,* 662 F.3d at 749; *Griffin,* 308 F.3d at 653. "The diligence required for equitable tolling purposes is reasonable diligence, not maximum diligence." *Holland*, 130 S.Ct. at 2565. That being said, the Sixth Circuit has held that excessive delays in filing lack appropriate diligence. *See e.g. Keeling v. Warden*, 673 F.3d 452, 463-64 (6ᵗʰ Cir. 2012); *Vroman v. Brigano*, 346 F.3d 598, 605 (6ᵗʰ Cir. 2003)(stating that a court should be "much less forgiving . . . where the claimant failed to exercise due diligence in preserving his legal rights").

Sloane argues he is entitled to equitable tolling for the following reasons:

> The Petitioner believes that his case is appropriate for 'equitable tolling' and furthermore, that he is entitled to it. * * * In this instance, the Petitioner has continuously pursued his rights diligently, by seeking legal assistance to file his Direct Appeal, his Appellate Rule 26(B) claims, his Appeal to the Ohio Supreme Court, and now through his Writ of Habeas Corpus.
>
> The record is replete with Petitioner in fact, seeking assistance from other prisoners to assist him with whatever filing he has had in order to diligently pursue his rights in this criminal matter. Consequently, the Petitioner is mentally retarded and has been suffering with this 'mental disorder' prior to this criminal

-22-

action.  See In re 2002-CR-00311 Alfie T. Sloane Criminal Docket Sheet No. 297 (10/7/02) (Cited in passim) (hereinafter "Docket Sheet").

Notwithstanding these irrefutable facts, the Petitioner has sought assistance from whatever sources available to aid him in filing these matters in Court with a 'reasonable diligence' as recognized by the Supreme Court in *Holland v. Florida*, 560 U.S. 631, 652, 130 S.Ct. 2549, 2564 ( 2010).

Accordingly, what circumstances could be more 'extraordinary,' dynamic or relative than those that direct confront the *Pro Se* litigant's 'mental capacity,' the very person seeking relief through this Writ, he's the individual who has been diagnosed with a mental disorder and disability.  Certainly, this would qualify as 'mitigating circumstances' that would warrant some consideration, in a case by case review.

In pursuit of this reasoning, this matter becomes particularly serious for the mentally ill, when he is confronted with the possibility of a procedural dismissal, which he would have no knowledge of, this procedural dismissal in essence would categorically bar him from any review of his Constitutional claims regardless of their potential merits, and therefore deny the mentally ill prisoner the protections of the Great Writ of Habeas Corpus entirely, risking injury to an important interest in human liberty, i.e., his freedom from unlawful restraint.  *See, Lonchar v. Thomas*, 517 U.S. 314, 324 (1996).

 (Doc. No. 14 at 4-5.)

In *Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir. 2011), the Sixth Circuit held that "a petitioner's mental incompetence, which prevents the timely filing of a habeas petition, is an extraordinary circumstance that may equitably toll AEDPA's one-year statute of limitations."  In that case, Ata asked the district court to equitably toll AEDPA's limitations period because his mental incompetence had prevented him from timely filing his petition.  In support of this assertion, Ata alleged he had "'missed the [filing] deadline because he had been hospitalized on numerous occasions for paranoid schizophrenia and other psychoses" and "'[t]hese mental ailments . . . disabled him in terms of being able to be percipient of notices of filing requirements or changes in the habeas law pursuant to the [AEDPA]."  *Id.* at 740.  He further stated he "'missed the deadline

-23-

because he has been and continues to be medicated by the Michigan Department of Corrections (MDOC) for paranoid schizophrenia and other psychoses" and described these medications as "debilitating." *Id.* Moreover, in an affidavit attached to his motion for equitable tolling, Ata averred that "due to my mental incapacitation I did not understand the one-year limitation placed on habeas petitioners." *Id.* He requested the district court conduct an evidentiary hearing. *Id.*

The district court denied Ata's motion for equitable tolling and request for evidentiary hearing, concluding Ata had provided only "unsupported and conclusory allegations" and "failed to establish that he was incompetent during all or even a significant portion of the over five years he allowed to lapse before the limitations period expired." *Id.*

The "sole contested issue on appeal [was] whether Ata sufficiently alleged in his motion for equitable tolling that his mental incompetence prevented him from timely filing his habeas petition so that he was entitled to an evidentiary hearing to resolve his tolling claim." *Id.* at 741. In resolving this question, the Sixth Circuit first affirmed its previous holding in the unreported decision *McSwain v. Davis*, 287 Fed. Appx. 450, 456 (6th Cir. 2008) that mental incompetence may provide a basis for equitable tolling. *Id.* It explained that:

> To obtain equitable tolling of AEDPA's statue of limitations on the basis of mental incompetence, **a petitioner must demonstrate that (1) he is mentally incompetent and (2) his mental incompetence caused his failure to comply with AEDPA's statute of limitations.** In short, a blanket assertion of mental incompetence is insufficient to toll the statute of limitations. Rather, a causal link between the mental condition and untimely filing is required. *See McSwain*, 287 Fed. Appx. at 456.

*Id.* at 742 (emphasis added). The court then concluded that "[a]lthough an evidentiary hearing need not be provided as a matter of right, an evidentiary hearing is required when sufficiently specific allegations would entitle the petitioner to equitable tolling on the basis of mental

incompetence which caused the failure to timely file." *Id.*

Upon review of his petition and motion for equitable tolling, the Sixth Circuit found Ata had set forth sufficiently specific allegations of both mental incompetence and a causal connection between his incompetence and the untimely filing of his petition.  *Id.* at 743-744.  The court explained as follows:

> Although many of the instances in the record of his past medical treatment occurred before incarceration, Ata specifically alleged that his petition was untimely "because he had been hospitalized on numerous occasions for paranoid schizophrenia," and "because he has been and continues to be medicated by the Michigan Department of Corrections (MDOC) for paranoid schizophrenia and other psychoses." **Ata, thus, pointed to two specific ways—being hospitalized and medicated—in which his mental illness prevented him from understanding and complying with AEDPA's statute of limitations.  Further, Ata provided in his affidavit that "due to my mental incapacitation I did not understand the one-year limitation placed on habeas petitioners."** [footnote omitted]  Given the applicable *pro se* standard, we read Ata's allegations to state that he was incapacitated for the period in question and that his incapacitation prevented him from timely filing his petition. While certainly not elaborate, Ata's allegations are specific enough to assert a causal link between his mental incompetence and his untimely petition.  *See McSwain,* 287 Fed.Appx. at 456 (finding allegation of causal link required); *Riva [v. Ficco],* 615 F.3d [35] at 40 [1st Cir. 2010]; *Bolarinwa [v. Williams],* 593 F.3d [226] at 231–32 [2nd Cir. 2010]; *Nara [v. Frank],* 264 F.3d [310] at 320 [3rd Cir. 2001]; *Laws [v. Lamarque],* 351 F.3d [919] at 923 [9th Cir. 2003]; *Hunter [v. Ferrell],* 587 F.3d [1304] at 1309–10 [11th Cir. 2009].

*Id.* at 743 (emphasis added).  The court then concluded there was nothing in the record that refuted Ata's request for equitable tolling, noting that "the record contains no information inconsistent with Ata's claims of mental incompetency in the years between the end of his direct review and the initiation of his collateral review."  *Id.* at 744.  Although the court noted it was not clear that Ata would meet his burden of demonstrating his entitlement of equitable tolling, it reversed the district court's decision and remanded for an evidentiary hearing to resolve the issue.

Distinguishing *Ata,* Respondent argues Sloane is not entitled to either an evidentiary hearing

-25-

or equitable tolling because "has made nothing more than a 'blanket assertion' of his mental incompetence." (Doc. No. 17 at 15.)  Respondent maintains that "each and every competency assessment resulted in a finding that petitioner was competent (except for the first one which was followed by successful treatment restoring petitioner to a competent state)" and, therefore, Sloane has failed to make a threshold showing of mental incompetence. *Id*. at 15-16.  Respondent further argues Sloane has failed to demonstrate he was mentally incompetent between the date the statute of limitations began to run and the date on which it expired; i.e., from February 19, 2010 to February 18, 2011.  Finally, Respondent argues Sloane has not shown a causal connection between his mental incompetence and the untimely filing of his Petition.

The Court agrees with Respondent.  Unlike the petitioner in *Ata*, Sloane fails to make any specific allegations that he was mentally incompetent during the relevant time period (i.e., between February 2010 and February 2011), or that any such incompetence caused the untimely filing of his Petition.  While it is undisputed Sloane has been variously diagnosed with several severe mental disorders (including Paranoid Schizophrenia, Psychotic Disorder, and Dissociative Disorder), he does not sufficiently allege that his mental condition during the limitations period rendered him incompetent to pursue his federal habeas rights.  In this regard, the Court notes that, although Sloane was initially found incompetent to stand trial, the record reflects he received medical treatment for his mental conditions that successfully restored him to competency.  As noted *supra*, Sloane underwent competency evaluations by three different psychologists between February 2003 and July 2004, and each time was found competent to stand trial and assist in his own defense. (Doc. No. 17-1, Exhs. C, F, G.)  Significantly, Sloane does not assert his mental condition has worsened since his last competency evaluation in July 2004, nor does he allege he suffered side

effects from his anti-psychotic medications or that they otherwise prevented him from timely filing his Petition.  Indeed, Sloane makes no allegations whatsoever regarding his medications in any of his filings before this Court.  Moreover, Sloane makes no allegation he was incompetent during the relevant time period nor does he make any specific allegation suggesting his mental condition somehow prevented him from timely filing his Petition.

In addition, the record reflects that, on October 1, 2009, Sloane was sufficiently competent to file his *pro se* 26(B) Application to Reopen his Appeal.  (Doc. No. 9-2, Exh. 80.)  As Respondent correctly notes, this was only four and a half months prior to the date on which the statute of limitations began to run; i.e., February 19, 2010.  Sloane offers no explanation as to why he was capable of pursuing state collateral review on a *pro se* basis in October 2009 but was mentally incompetent to prepare and file his federal habeas petition thereafter.  The Court finds Sloane's lack of explanation on this point further weighs against the application of equitable tolling in this case. *See e.g. Bilbrey v. Douglas*, 124 Fed. Appx. 971, 973 (6th Cir. 2005) (disallowing equitable tolling on the basis of mental incapacity where the habeas petitioner had pursued state court litigation even during the periods when her mental condition was the most impaired); *Price v. Lewis*, 119 Fed. Appx. 725, 726-27 (6th Cir. 2005) (disallowing equitable tolling based on mental illness where the habeas petitioner had actively pursued his claims during the limitations period).

Finally, the Court notes that Sloane alleges he is "mentally retarded."  (Doc. No. 14 at 4-5.) He submits no evidence to support this allegation, however.  Moreover, there is no evidence in the state court record before this Court that Sloane was ever successfully tested with regard to his IQ

level,[11] and none of the competency evaluations discussed above diagnose Sloane as mentally

retarded.  Indeed, to the contrary, in his March 2003 sanity evaluation, Dr. Palumbo concludes that,

at the time Sloane was charged, he was "not suffering from a mental defect, such as mental

retardation."[12]  (Doc. No. 17-1, Exh. D.)  Similarly, Dr. Nalluri's December 2003 forensic

psychiatric evaluation states he administered a "mental retardation screening test" to Sloane and it

"did not reveal any evidence of mental retardation."[13]  (Doc. No. 17-1, Exh. F at p. 36.)  Finally, the

Court notes that both Dr. Sirkin and Dr. Eberle diagnosed malingering, casting further doubt on

Sloane's allegations that he is mentally retarded.  Indeed, Dr. Eberle specifically noted that Sloane

demonstrated "sufficient and appropriate knowledge" of the charges against him, the judicial

proceedings, and the roles of the participants in those proceedings; and, observed that Sloane "has a

history of manipulating presentations of his knowledge in this area for obvious purposes and may

well do so again, but there is nothing in his mental status or psychiatric disabilities to scientifically

explain such changes and manipulations."  (Doc. No. 17-1, Exh. G.)  Accordingly, and for all the

---

[11]  In August 2002, Dr. Palumbo attempted to administer the Wechsler-Adult Intelligence Scale- Third Edition but discontinued the testing after Sloane "gave bizarre statements to many of the test items and would often miss easy items."  (Doc. No. 17-1, Exh. B.)  Dr. Palumbo assessed that Sloane appeared to be functioning in the low-average range of intelligence.  *Id.*

[12]  In that report, Dr. Palumbo states that Sloane "was not suffering from mental retardation at the time of the events leading up to his arrest. He stated that he had been in special education and had not graduated from high school.  He stated he had received SSI benefits, and it may have been for a low level of intellectual functioning or a combination of that and mental illness, but he did not know. Certainly, his fund of every day information and vocabulary, as noted in the statements he gave to the detectives around the time of his arrest, indicate at least borderline intellectual functioning."  (Doc. No. 17-1, Exh. D.)

[13]  Dr. Eberle did not administer an intelligence test, but does state that Sloane's "conversation suggested only low-average intellectual capacity at best." (Doc. No. 17-1, Exh. G at p. 44.)

-28-

above reasons, the Court finds Sloane's allegation that he is mentally retarded is contradicted by the record.

Even assuming Sloane suffered from some degree of impaired intellectual functioning, the Court finds he has not sufficiently alleged a causal link between his impairment and the untimely filing of his habeas petition.  Specifically, Sloane makes no allegation that impaired intellectual functioning rendered him incapable of understanding the AEDPA filing deadline, or otherwise prevented him from preparing and submitting his habeas petition on a timely basis.  *See e.g. Starks v. Easterling*, 2014 WL 4347593 at * 7 (M.D. Tenn. Sept. 2, 2014) ("A habeas petitioner's mild mental retardation is not grounds for equitably tolling the limitations period in the absence of any indication that the mild mental retardation made him unable to manage his court filings or participate in the court proceedings") (citing *Pinchon v. Myers*, 615 F.3d 631, 641-42 (6th Cir. 2010)).

Accordingly, and for all the reasons set forth above, the Court finds Sloane has failed to sufficiently allege that he was mentally incompetent during the relevant time period (i.e., between February 2010 and February 2011), or that any such incompetence caused the untimely filing of his Petition.  Because Sloane has not demonstrated that "an extraordinary circumstance stood in his way and prevented his timely filing," the Court finds he is not entitled to equitable tolling.

### D.    Actual Innocence

In *McQuiggin v. Perkins*, ___ U.S. ___, 133 S. Ct. 1924, 1928, 185 L. Ed. 2d 1019 (2013), the United States Supreme Court recently held that actual innocence, if proved, may overcome the expiration of AEDPA's one-year statute of limitations.  The Court noted that a claim of actual innocence is not a request for equitable tolling but, rather, a request for an equitable exception to §

-29-

2244(d)(1).  *Id.* at 1931.  The Supreme Court explained, however, that "tenable actual-innocence gateway pleas are rare."  *McQuiggin*, 133 S.Ct. at 1928.  In such cases, a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

Here, Sloane has not argued that he is actually innocent.


## IV.  Conclusion

Accordingly, and for all of the foregoing reasons, it is recommended that this matter be DISMISSED as time barred.

/s/ *Greg White*
U.S. Magistrate Judge

Date: <u>December 2, 2014</u>


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

-30-